**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

In re:

**MARINER SEAFOOD, LLC,**

          **Debtor.**

**Chapter 11**

**Case No: 20-**

## AFFIDAVIT OF JOHN P. FLYNN IN SUPPORT OF FIRST-DAY MOTIONS

I, John P. Flynn, hereby declare as follows:

    1.    I am the founder, sole member, and Manager of Mariner Seafood, LLC ("**Mariner**" or the "**Debtor**").  In this capacity, I am familiar with Mariner's day-to-day operations, business and financial matters.

    2.    I make this affidavit in support of the Debtor's *Motion to Sell Substantially All Assets Free and Clear of Liens, Claims, Interests and Encumbrances and Approve Bid Procedures in connection with the Sale* (the "**Sale Motion**"), the *Motion for Entry of Order (1) Authorizing the Use of Cash Collateral; (2) Granting Replacement Liens, and (3) Granting Related Relief* (the "**Cash Collateral Motion**"), the *Motion to Pay Pre-Petition Wages in the Ordinary Course* (the "**Wage Motion**") and the *Emergency Motion of Debtor for Order Authorizing (A) the Continued Use of Debtor's Cash Management System, and (B) Maintenance of Debtor's Existing Bank Account and Business Forms* (the "**Account Motion**" and with the Sale Motion, the Cash Collateral Motion and the Wage Motion, the "**First Day Motions**").

    3.    Except as otherwise indicated, all statements in this affidavit are based upon (a) my personal knowledge as an officer of Mariner, (b) my review of relevant documents, including the Debtor's books and records; (c) information supplied to me by other members of the

Debtor's management and employees, or other professionals retained by Mariner; and (d) my

opinion based upon my experience and knowledge of Mariner's operations and financial affairs.

4.      On September 14, 2020 (the "**Petition Date**") the Debtor filed a voluntary

petition for relief under Chapter 11 of 11 U.S.C. §§101 *et. seq*. (the "**Bankruptcy Code**").  The

purpose of the Chapter 11 case is to conduct an orderly sale of the assets of the Debtor for the

benefit of its creditors pursuant to Section 363 of the Bankruptcy Code.

### THE DEBTOR'S BUSINESS

5.      I founded Mariner in a small office in Middletown, Rhode Island in 1998.  It was

originally organized in the State of Rhode Island in September 2006 and ultimately organized

following merger in the Commonwealth of Massachusetts in December 2015.  I own one-

hundred percent of the equity interests in Mariner.

6.      For several years after its founding, Mariner concentrated its business on the

buying and selling seafood inventory from third party importers to domestic and Canadian

seafood processors and food service distributors.  Mariner later expanded to importing products

from Asian markets, to supply wholesale distributors and processing plants.

7.      By 2008, Mariner's annual revenue grew to approximately $22 million.  In the

fall of that year, Mariner commenced its own seafood processing operations.  In connection

therewith, Mariner moved its facility to New Bedford, Massachusetts and substantially grew its

permanent staff.  It also enlisted a sizeable contract workforce for its processing operations.

8.      Between 2011 and 2012, Mariner expanded processing activity and sales to

include foodservice distributors, routinely employing between 50 and 70 people in its processing

and distribution activities. Thereafter, Mariner relocated its operating company and processing

business to its present larger facility at 14 South Street, New Bedford and, among other things,

began a scallop packing division.  The South Street facility, totaling approximately 32,000 square feet, is leased to the Debtor by Flynn Realty, LLC (the "**Flynn Lease**").  I am the manager and sole owner of Flynn Realty.  Mariner leases a separate neighboring facility, comprised approximately 36,000 square feet from an unrelated third party, MacArthur Drive LLC (the "**MacArthur Lease**").

9.      As its customer base and demand grew, Mariner purchased more automation equipment and expanded its workforce.  By 2015, Mariner had annual revenue of approximately $38.5 million and its contract workforce of approximately 120 personnel.  In August of that year, Mariner contracted with a fast growing home delivery/meal kit company known as Blue Apron ("**Blue Apron**").  As a result of this contract, Mariner's sales increased to approximately $70 million in 2016.  To service the contract, Mariner nearly doubled its workforce and purchased new specialized equipment.

10.      In June 2017, Blue Apron went public on the New York Stock Exchange.  It subsequently stopped purchasing from Mariner.  As a result, Mariner was forced to consolidate its operations and effectuate a reduction-in-force.  In order to replace some of the revenue lost from Blue Apron, Mariner determined to transition to processing and selling consumer packaged goods ("**CPG**") directly to retailers.  Mariner was able to repurpose much of the equipment that it had acquired to service the Blue Apron contract to process CPG, but still incurred unbudgeted capital expenditures of more than $500,000 during the transition.

11.      Mariner financed much of its operation and equipment and inventory purchasers through one or more credit lines.  On or about May 25, 2018, Mariner refinanced its loan obligations to Santander Bank, N.A. with Wells Fargo Bank, N.A. ("**Wells**") and Wells Fargo Equipment Financing, N.A. ("**Wells Finance**" and with Wells, the "**Wells Entities**").  Wells

provided to Mariner a revolving credit line in the maximum principal amount of $10 million to fund Mariner's operations (the "**Revolving Loan**").  Wells Finance provided Mariner with a term loan in the approximate amount of $853,000 to fund, among other things, equipment purchases (the "**Term Loan**" and with the Revolving Loan, the "**Wells Loans**").  In connection with the Wells Loans, Mariner executed a variety of loan documents and granted to Wells a security interest in all or substantially all of its assets.  Mariner Seafood Marketing, LLC, an affiliated entity which owned, at the time, certain trademarks used in Mariner's operations ("**Mariner Marketing**"), and I executed guaranties of the Wells Loans.[1]

12.     In the summer of that year Mariner and a large national retailer entered into negotiations for a major supply contract estimated to total approximately $38 million in annual purchases.  In anticipation of finalizing this major supply contract, Mariner hired additional employees, acquired and pre-packed a substantial amount of frozen "back up" inventory, purchased branded packaging, and produced specialized training videos and marketing materials for the retailer's stores.

13.     In late 2018 following these substantial expenditures, Wells asserted that Mariner was in default of the Revolving Loan because the frozen seafood inventory acquired in connection with the potential contract was no longer eligible to be counted as collateral in the borrowing base calculation resulting in an asserted overadvance.

14.     In the spring of 2019 the negotiations with the national retailer terminated and the retailer discontinued the Mariner product line.  As a result, Mariner was forced to effectuate an immediate reduction-in-force and otherwise cut costs and overhead. Mariner was also forced to find alternative buyers for inventory it had purchased in anticipation of the potential contract.

---

[1] My wife, Leslie, and I own all of the equity interests in Mariner Marketing.

Given that some of the inventory had already been specially packaged, it had to be repackaged, which was both costly and time-consuming.

15.     In the second half of 2019, Mariner explored options to refinance its obligations to the Wells' Entities, sell its assets, or facilitate equity investment to improve its cashflow and address Wells' asserted defaults.  Several parties expressed interest and attended management presentations at Mariner's premises in late 2019 and early 2020.

16.     In January 2020, Mariner determined to retain Jon Pratt of Tully & Holland, Incorporated ("**T&H**") as investment banker to assist in the refinancing or sale of its assets. T&H worked with Mariner to develop marketing and financial materials which were circulated to strategic investors and acquirers.  Mariner received several expressions of interest and meetings and management presentations took place with interested parties.

17.     With the onset of the COVID-19 pandemic, the sale process effectively halted. COVID-19 negatively impacted Mariner's business forcing an additional reduction in force. From March to May, sales fell approximately thirty-five percent (35%).

18.     In late June and early July 2020, Mariner commenced negotiations with True North Seafood, Inc., an affiliate of Cooke Aquaculture Inc., a multinational seafood processor and retailer ("**True North**" or the "**Buyer**") regarding a sale of Mariner's assets.  After extensive negotiations by and between Mariner and True North, the parties entered into an Asset Purchase Agreement pursuant to which True North agreed to purchase all or substantially all of Mariner's assets (as more fully described below, the "**APA**").  The purchase price for the assets under the APA is: (a) the amount of the Debtor's accounts receivable up to $2,200,000, plus (b) $150,000, plus (c) $400,000 to fund the professional fees costs associated with this proceeding and consummating the purchase.   Pursuant to the APA, the Buyer will assume Mariner's obligations

Case 20-11870    Doc 10    Filed 09/14/20    Entered 09/14/20 13:45:42    Desc Main
Document      Page 6 of 14

under the Term Loan, and take assignment of certain unexpired leases and executory contracts

including, without limitation, the following:

    a.   The MacArthur Lease;[2]

    b.   Four (4) equipment leases of forklifts and pallet trucks from Wells Finance (the "**Wells Leases**");

    c.   A lease of several trucks from Ryder Truck Rental;

    d.   Certain cold storage facility rental arrangements; and

    e.   Certain life insurance policies of which the Debtor is the beneficiary.

The forgoing unexpired leases and executory contracts, together with additional leases and contracts which may be designated for assignment by the Buyer under the APA are collectively referred to as the "**Assigned Contracts**."  The Buyer is required to pay the costs to cure the Assigned Contracts at the closing of the sale.

19.    Wells is owed approximately $4.2 million under the Revolving Loan. Notwithstanding that the purchase price under the APA is less than that amount, Wells has agreed to consent to the sale to the Buyer, release its liens on the Debtor's assets with such liens attaching to the proceeds of the sale, and to carve out from the Debtor's cash collateral and the proceeds of the sale, the amount of $400,000 to pay the fees and expenses of the Debtor's professionals associated with the administration of this case and closing the sale to the Buyer (the "**Carve Out**").  At the closing of the Sale, the Debtor's estate will receive cash from the Sale equal to the sum of $50,000 plus the amount by which the Debtor's accounts receivable under the APA are less than $2,200,000.  The Buyer will receive the remaining cash.  The Debtor's estate will retain the Carve Out to pay allowed fees and expenses in this Chapter 11 case.

20.     I have negotiated and agreed to an employment contract with True North to act as
Regional Director of Sales and Distribution, Northeast after the closing of the sale.  Under that
agreement, I will make salary which is consistent with industry standards, including certain
potential bonuses which may be available after calendar year 2020.

### THE DEBTOR'S ASSETS

21.     The Debtor currently employs a sales and management staff of eight (8) people.
It contracts with a staffing agency for the services of another approximately 125 processing and
production personnel.

22.     The Debtor's tangible assets include, without limitation, (a) inventory, (b)
machinery and equipment used in proceeding activities, (c) leasehold interests in its two
facilities, (d) certain trademarks and trade names, (e) certain permits and licenses used in the
operation of its business, and (f) used office furniture and equipment.

23.     The Debtor's inventory includes a significant volume of fresh seafood, which
seafood is regularly bought and sold and passes through the Debtor's inventory within several
days, frozen seafood which is sold on a more periodic basis, and packaging and labeling
materials.

24.     The Debtor's equipment (the "**Mariner Equipment**") was the subject of an
October 24, 2019 appraisal which assigned to it an orderly liquidation value of $845,790.  The
same appraisal estimated that the costs of such an orderly liquidation would total approximately
$235,000, resulting in a net orderly liquidation value of approximately $610,000.

25.     The Debtor also holds leasehold interests under the Real Estate Leases.  The
landlord-counterparty under the MacArthur Lease is MacArthur Dive, LLC, an unrelated

---

[2] Flynn Realty, LLC and the Buyer shall enter into a new lease for the South Street facility, effective upon the
closing of the sale to the Buyer.

Massachusetts entity.  The base rent under that Lease is $20,000 per month and it has a term

through December 31, 2022.  The landlord-counterparty under the South Street Lease is Flynn

Realty, LLC, an entity of which I am the sole member and manager. The base rent under the

South Street Lease is $15,000 per month and it has a term through December 31, 2023.

26.     Mariner Marketing transferred the trademarks that the Debtor uses in in its

business to the Debtor prior to the commencement of this Chapter 11 case.

27.     The Debtor leases multiple vehicles used in its operations.  It leases three (3)

forklifts and eight (8) pallet trucks under the Wells Leases.

28.     The Debtor's accounts receivable total approximately $2.7 million with

approximately $125,000 more than 60 days due.

### THE DEBTOR'S LIABILITIES

29.     The Debtor is current on its payment obligations under the Wells Loans.  The

Wells Entities assert to be owed approximately $4.8 million by the Debtor under the Wells

Loans, consisting of approximately $550,000 under the Term Loan and the balance under the

Revolving Loan.  The Wells Entities assert those obligations are secured by liens upon all or

substantially all of the Debtor's assets pursuant to UCC-1 financing statements filed with the

Secretary of the Commonwealth.  Wells asserts liens on the trademarks previously held by

Mariner Marketing pursuant to a certain Trademark Collateral Agreement executed by Mariner

Marketing in May 2018.

30.     Wells Finance is also the lessor under the Wells Leases and asserts to be owed

approximately $100,000 in connection therewith, secured by asserted liens on the leased

equipment evidenced by separately filed UCC-1 Financing Statements.

31.     The owners of five (5) cold storage facilities in Massachusetts and Virginia, at which the Debtor stores inventory for processing and distribution assert to be owed approximately $75,000 in storage and other charges in the aggregate.  Those owners may assert warehouseman's liens against the stored inventory under applicable law on account of those obligations.  The owners have executed certain landlord waivers, in which each "acknowledges that the security interest of [Wells] in the Collateral is senior and superior to any claim or right in all or any portion thereof which Landlord now has or may have at any time hereafter acquire as so long as ALL storage charges have been paid in full."

32.     The Debtor's unsecured debt totals approximately $7.8 million, inclusive of approximately $1.2 million of debt to insiders.

33.     The Debtor pays approximately $120,000 per week to its staffing agency for the services of its approximately 125 contract processing and production personnel.

### RELIEF REQUESTED BY THE DEBTOR

34.     The purpose of the Debtor's Chapter 11 proceeding is to effectuate a sale of substantially all of its assets.  As part of its efforts, the First Day Motions seek the following necessary relief from the Court:

**A.     The Cash Collateral Motion.**

35.     The Debtor filed the Cash Collateral Motion seeking authority to use cash collateral in which Wells or any other entity may assert an interest.  The Debtor requires the use of cash collateral to operate its business and pay its usual and customary expenses in advance of the sale.

36.     Attached to the Cash Collateral Motion is a budget showing the Debtor's projected receipts and disbursements during the period for which cash collateral usage is requested, and which I have review prior to making this Affidavit.  I believe that the budget represents the reasonable projections for the Debtor's operation during the period for which cash collateral usage is requested.  The budget includes a line item for payments to professionals of the Debtor which will be paid into a segregated account.  The budget also includes a line item for payment to the Debtor's staffing agency for the services of the Debtor's approximately 125 processing and production personnel.

37.     As is demonstrated by the budget, the Debtor has sufficient cash collateral to fund its operations and maintain its assets during the sale process.

38.     The Debtor's ability to maintain relationships with its vendors, suppliers and customers, and to pay its day-to-day expenses, is essential to the Debtor's continued viability. Absent the use of cash collateral: (a) the Debtor does not have sufficient available sources of working capital and financing to carry on the ordinary course operation of its business; (b) the continued operation of the Debtor's business would not be possible, and serious and irreparable harm to the Debtor, its assets and its estate would occur; and (c) it will not be possible to preserve the Debtor's going concern value and the opportunity presented in the Sale Motion would be lost – all to the detriment of the Debtor's creditors and interest holders.  The approval of the use of the cash collateral on the terms set forth in the Cash Collateral Motion is, therefore, in the best interests of the Debtor, its bankruptcy estate and its creditors.

**B.    The Motion to Pay Prepetition Wages and Benefits.**

39.     The Debtor has filed the Wage Motion seeking authority to pay or honor, in the ordinary course of business, its employees' prepetition wages, reimbursable expenses, associated

taxes, and vacation and sick pay obligations.  Under the Debtor's standard payroll procedures,
the payrolls are processed weekly in arrears – on the Thursday of the week following the relevant
weekly pay period.  The total amount of the Debtor's prepetition wage obligations is
approximately $22,000. The Debtor customarily reimburses employees who incur a variety of
business expenses in the ordinary course of performing their duties on behalf of the Debtor,
including, among others, those incurred in connection with travel, lodging, long-distance
telephone charges, and cellular phone charges.  The Debtor provides eighty (80) hours of paid
vacation for employees per year.  The Debtor also provides up to five (5) days' sick pay for
employees per year.  No employee will receive more than $13,650 on account of payment of the
pre-petition wage obligations and the continued compliance with the Debtor's vacation and sick
leave policies.

40.    The Wage Motion also seeks authority to pay the reported prepetition claims
under their health care plan (the "**Health Plan**") and the Debtor's workers' compensation
insurance in the ordinary course.  The Debtor offers a health and dental plan that is administered
by Blue Cross Blue Shield.  The Debtor pays monthly premiums under the Health Plan and also
pays the direct employee health claims, less any deductibles or co-pays paid by employees.  I
understand that the proposed payments will not exceed the statutory ceilings set forth in 11
U.S.C. § 507(a)(5).

41.    Finally, the Debtor requests authority to use business forms for a limited period of
time to allow the payments requested to be made in the Wage Motion to be honored in the
ordinary course of business.

42.    It is crucial that the Debtor be permitted to pay its prepetition wage obligations, to
fund its benefit programs, and to honor prepetition vacation and sick pay in the ordinary course

of business. A potential loss (or delay in receipt) of earned wages or salaries would impose a

hardship on the employees, may damage employee morale and may result in the loss of

employees at a critical time. Approval of such payments will assist in maintaining the continuity

of the Debtor's businesses and will preserve the value of the Debtor's operations and assets.

**C.      The Sale Motion.**

43.      The Debtor has filed the Sale Motion seeking authority to sell its assets to True

North, subject to the receipt of higher and better offers. As is described in the affidavit of Jon

Pratt filed contemporaneously with this affidavit, the Debtor engaged in substantial efforts to sell

its assets prior to commencing this proceeding. Among other things, the Debtor worked with

Mr. Pratt and his firm to:

    a.      Identify and contact approximately forty-five potential acquirers;

    b.      Prepare and distribute an offering memorandum and other marketing
            materials;

    c.      Establish and provide access to a virtual data room with diligence
            materials;

    d.      Conduct multiple management presentations at the Debtor's premises with
            interested parties; and

    e.      Review and respond to inquiries of interested parties.

44.      After consideration of the expressions of interest and in consultation with Wells,

the Debtor determined that True North has submitted the best proposal to purchase the assets.

That proposal was subsequently reduced to a written APA to purchase the assets and assume the

Debtor's remaining obligations under certain of its loans, contracts, and leases in exchange for

(a) the amount of the Debtor's accounts receivable up to $2,200,000, plus (b) $150,000, plus (c)

$400,000 to fund the professional fees costs associated with this proceeding and consummating

the purchase. Pursuant to the APA, True North will assume the Debtor's obligations under the

Term Loan and the Debtor will take assignment of the MacArthur Lease, the Wells Leases, and certain other designated leases and contracts to True North.

45.     The Sale Motion seeks expedited approval of procedures relating to the marketing and sale of the Debtor's assets, including the establishment of bid deadlines, hearing dates, and procedures for becoming a qualified bidder (the "**Bid Procedures**").  The Bid Procedures have been agreed to by True North and are required to be approved prior to soliciting higher and better offers and closing on the sale as required under the APA.

46.     The Sale is required to close on or before October 16, 2020.  In order to ensure appropriate noticing and provide for solicitation of counteroffers, the Debtor requests that the Court consider the Bid Procedures on an expedited basis.

**D.     The Account Motion.**

47.     The Debtor has filed the Account Motion seeking to use its existing bank account during its bankruptcy case. As set forth in that motion, the Debtor operates with a single operating account at Wells (as defined in the Account Motion, the "**Account**").  Approximately fifty percent (50%) of the Debtor's receipts for its goods and services are made through ACH or wire payments into the Account.  Among other things, opening a new post-petition account may interfere with the Debtor's post-petition receipts.  Given that the Debtor is conducting the Sale and the purchase price for the Assets is directly related to the value of the Debtor's accounts receivable and that cash is being disbursed at the closing based upon the amount of those accounts, requiring the Debtor to close the Account may complicate the closing of the Sale and prejudice the estate.

48.     Wells would prefer that the Debtor maintain the Account and will, as is its custom and practice, change the name on the Account post-petition to reflect that the Debtor is operating as a debtor-in-possession.  The Debtor's personnel will distinguish between prepetition and post-petition obligations without closing existing Account and opening a new one.  The Debtor will continue to maintain records with respect to all transfers of cash so that it may readily account for all transfers in and out of the Account.  The Debtor would be subject to a substantial administrative burden and expense if they were required to close and reopen the Account and create an entirely new system for issuing checks and paying post-petition obligations.

Signed under the pains and penalties of perjury.

John P. Flynn

9/11/2020