UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>**MARINER SEAFOOD, LLC**<br><br>Debtor | Chapter 11<br><br>Case No: 20-11870-FJB |

**AFFIDAVIT OF JOHN P. FLYNN IN SUPPORT OF CONFIRMATION OF
FIRST AMENDED JOINT LIQUIDATING PLAN OF MARINER SEAFOOD, LLC AND
THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

Pursuant to 28 U.S.C. § 1746, I, John P. Flynn, hereby submit this affidavit (the "**Affidavit**") in support of confirmation of the *First Amended Joint Liquidating Plan of Mariner Seafood, LLC and the Official Committee of Unsecured Creditors* (the "**Plan**"),[1] and state as follows:

1. The statements made in this Affidavit are based upon my personal knowledge, except where it is noted that they are on information and belief, in which instance I am informed and believe such statements to be true.

2. During the course of this Chapter 11 bankruptcy proceeding, I served as president of Mariner Seafood, LLC (the "**Debtor**"). I am familiar with the operations, business and financial affairs of the Debtor, both prior to and during the Chapter 11 Case.

**BACKGROUND**

3. The Debtor was originally organized in the State of Rhode Island in September 2006 and ultimately organized following merger in the Commonwealth of Massachusetts in December 2015. The Debtor was a seafood processor headquartered in New Bedford, Massachusetts, where it employed the majority of its employees. In the years following its

---

[1] Capitalized terms not otherwise defined in this affidavit shall have the meanings ascribed to them in the Plan.

founding, the Debtor concentrated its business on the buying and selling seafood inventory from third party importers to domestic and Canadian seafood processors and food service distributors. The Debtor later expanded to importing products from Asian markets, to supply wholesale distributors and processing plants and later expanded further into the delivery and meal kit industry and then processing and selling consumer packaged goods.

4. In May 2018, the Debtor refinanced its revolving credit and equipment line of credit with Wells Fargo Bank, N.A. (the "**Lender**") and Wells Fargo Equipment Financing, Inc. ("**Finance**").

5. In the summer of 2018, the Debtor entered into negotiations with a large national retailer for a major supply contract estimated to total approximately $38,000,000 in annual purchases. In anticipation of finalizing this major supply contract, the Debtor hired additional employees, acquired and pre-packed a substantial amount of frozen "back up" inventory, purchased branded packaging, and produced specialized marketing materials for the retailer's stores.

6. In late 2018 and following these substantial expenditures, the Lender and Finance asserted that the Debtor was in default under its loans because certain of the frozen seafood inventory acquired in connection with the potential contract was no longer eligible to be counted as collateral, resulting in an asserted overadvance. At the time, the Lender and Finance asserted to be collectively owed approximately $4,800,000 and asserted that those obligations were secured by valid, perfected liens upon all or substantially all of the Debtor's assets, including its cash and receivables, pursuant to UCC-1 financing statements filed with the Secretary of the Commonwealth. Following the asserted default and among other things, the Lender ceased advancing on the revolving line, instituted strict cash management and spending controls on the

Debtor, and required the Debtor to provide weekly cash flow reporting.   Thereafter, the Debtor was forced to operate on a cash-flow basis and struggled to maintain ordinary course operations.

7.In the spring of 2019 the negotiations with the national retailer terminated and the retailer discontinued the Debtor's product line.  As a result, the Debtor was forced to effectuate an immediate reduction-in-force, cut costs and overhead, and find alternative buyers for inventory it had purchased.

8.In the second half of 2019 Mariner explored options to refinance its obligations to the Wells' entities, sell its assets, or facilitate equity investment to improve its cashflow and address the Lender's asserted defaults.  Several parties expressed interest and attended management presentations at Mariner's premises in late 2019 and early 2020.  In January 2020, the Debtor retained Jon Pratt of Tully & Holland, Incorporate as an investment banker to assist in refinancing or selling its assets.

9.With the onset of the COVID-19 pandemic the sale process effectively halted.  COVID-19 also negatively impacted the Debtor's business forcing an additional reduction in force.  From March to May 2020, sales fell approximately thirty-five percent (35%).

10.In the summer 2020 the Debtor was able to re-engage in the marketing process with the assistance of Tully & Holland, identified a stalking-horse acquirer, negotiated a sale agreement, and commenced this proceeding to preserve its assets and effectuate a sale.

11.On September 14, 2020 the Debtor filed the *Motion to Sell Substantially All Assets Free and Clear of Liens, Claims, Interests and Encumbrances and Approve Bid Procedures in connection with the Sale* (the "**Sale Motion**").  The Sale Motion requested, among other things, the approval of the sale of substantially all of the Debtor's assets to True North Seafood, Inc. ("**True North**") as a going concern.  Attached to the Sale Motion was an asset

purchase agreement and various related agreements that establish the Debtor's and True North's rights and obligations under the sale. After notice and hearing, the Bankruptcy Court approved the Sale by an order dated October 26, 2021 [docket no. 115].

12. The sale to True North closed on October 26, 2020. At the closing True North paid to or for the benefit of the Debtor the amount of $2,936,412 consisting of: $2,750,000 in cash to the Debtor's estate, $158,662 to counterparties to cure defaults under certain of the contracts assigned to True North under the asset purchase agreement, and $27,750 in accrued vacation liabilities to the Debtor's employees. In addition and in accordance with the Sale Motion, True North also assumed the Debtor's obligations under its equipment loan with Finance, which totaled approximately $525,000 as of the closing.

13. The Lender's claims against the Debtor and those of certain insiders of the Debtor have been withdrawn and/or released pursuant to a certain stipulation approved by the Court on February 18, 2021 [docket no. 155].

14. The Debtor is holding approximately $525,000 constituting proceeds of operations and the sale and a grant from a seafood processor relief fund established as part the 2020 CARES Act.

## THE PLAN

15. The Plan has been proposed jointly with the Official Committee of Unsecured Creditors (the "**Committee**"). I reviewed the terms of the Plan, and discussed the Plan with counsel for the Debtor prior to the filing of the Plan.

16. On the basis of my understanding of the Plan, the events that have occurred throughout the Debtor's Chapter 11 Case and discussions that I have had with the Debtor's

counsel, I believe that the Plan complies with the applicable provisions of Section 1129 of the Bankruptcy Code for the confirmation of a plan of liquidation.

17.     The purpose of the Plan is to establish a mechanism to complete the orderly wind down of the Debtor's business, to resolve disputed claims against the Debtor's bankruptcy estate, and to distribute the proceeds of the liquidation to creditors in accordance with the Plan and the priority established by the Bankruptcy Code.

18.     The Plan provides for the appointment of Mr. Peter Armanetti as liquidating agent (the "**Liquidating Agent**") who will wind down the Debtor's business, administer claims, and distribute the proceeds of the liquidation of the Debtor's assets in accordance with the Plan. The Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtor's estate for the benefit of its creditors.

19.     It is my understanding that, under the Plan, creditors with similar types of claims are treated equally.

20.     The release and exculpation provisions set forth in the Plan are intended to protect those parties who participated in the successful Chapter 11 Case from unmeritorious claims. The release and exculpation provisions release those parties from liability in connection with their participation in the Chapter 11 Case arising prior to the Effective Date.

21.     I believe the Debtor has complied with the requirement that the Plan be proposed in good faith.

22.     Neither the Debtor nor the Committee proposed the Plan for the purpose of avoiding taxes or the application of any securities laws.

23.     The Liquidating Agent is familiar with the Debtor's business and the claims given that he has previously served as financial advisor. It is expected that the Liquidating Agent can

perform his duties on a part-time basis. The Liquidating Agent shall be entitled to compensation, at an hourly fee equal to the regular rates for the Liquidating Agent as then in effect. The Liquidating Agent's current hourly rate is $250.

24. The Plan will be funded from the proceeds of the liquidation of the Debtor's assets, primarily consisting of the proceeds from the Sale. I believe that the Post-Confirmation Debtor will have sufficient funds to pay post-Effective Date costs of administering the Plan, to pay all Allowed Administrative and Priority Claims, and to return a dividend to the holders of Allowed non-priority unsecured claims.

25. All of the creditors who returned ballots voted to accept the Plan.

26. The estate presently consists of cash, potential causes of action, and other tangible and intangible assets. In the event the Debtor's Chapter 11 case is converted to a case under Chapter 7 of the Code, a Chapter 7 trustee would be appointed. There would necessarily be increased costs and delays while the Chapter 7 trustee familiarized himself/herself with the Debtor's remaining assets, the claims against the Debtor and other matters. The Chapter 7 trustee, moreover, would retain attorneys and accountants who would also need to engage in a similar learning process with similar delays. Unlike a Chapter 7 trustee, the Liquidating Agent will not be entitled to a commission under Section 326 of the Bankruptcy Code and is already familiar with the Debtor's business and the claims by creditors. By reducing the administrative costs, the Plan will provide for a higher dividend to non-priority unsecured creditors. At a minimum, however, the Plan will permit each class of creditors with at least as much as it would receive in a Chapter 7 scenario.

27. The Debtor has paid or will pay all invoiced fees owed to the Office of the United States Trustee by the Effective Date. The Plan requires the Post-Confirmation Debtor to pay all

accrued and future fees owed to the Office of the United States Trustee, and I believe that the Post-Confirmation Debtor will have sufficient funds to pay such fees.

28. The Plan provides for the liquidation and distribution of the Debtor's remaining assets. Accordingly, confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtor or any successor of the Debtor.

29. The Debtor did not owe retirement benefits, as that term is defined in Section 1114 of the Bankruptcy Code, to any party prior to confirmation of the Plan. Nor is the Debtor required to pay any domestic support obligations.

30. In light of the forgoing, I believe that confirmation of the Plan is appropriate, is in the best interests of all parties-in-interest and should, therefore, be granted.

*[Remainder of Page Intentionally Left Blank]*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 4Th day of February 2022

_____
John P. Flynn

806296